AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of West Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>4600 Blankenship Road<br>Huntington, West Virginia 25701 | )<br>)<br>)   Case No. 3:10-mj-00017<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Southern _____ District of _____ West Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1002 | Possession of altered documents to defraud the United States and |
| 18 U.S.C. § 498 | Forgery and falsely altering certificates of discharge from military service of the United States. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Benjamin M. LaBuz, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 30, 2010

*Judge's signature*

City and state: Huntington, West Virginia

Maurice G. Taylor, Jr., United States Magistrate Judge
*Printed name and title*

FILED
MAR 3 1 2010

ATTACHMENT A

4600 Blankenship Road, Huntington, WV 25701 can be described as a doublewide manufactured home with light green siding and dark green shutters. The house is elevated from the street. The driveway to the residence is approximately forty-five degrees off of Blankenship Road and rises several as it reaches the house. The front of the trailer faces Blankenship Road. There is a single front door with four wooden steps leading to it. The side of the house, facing the driveway, has a covered porch and a sliding glass door. The foundation of the residence is dull red in color. There is a small satellite dish on the front right corner of the home, as one faces the residence from the street. There are three mailboxes directly across the street from the residence. One of the mailboxes is marked with a green placard reading "4600". There is a white Dutchman camper trailer, a red Chevrolet sport utility vehicle and a red Chevrolet S-10 pickup truck parked in the driveway. The driveway is composed of gravel. There is also a large detached garage, approximately 200 feet from the residence and it is directly outside the sliding glass door, as one looks out from the interior of the residence.

ATTACHMENT B

a. All records relating to violations of 18 U.S.C. § 498 (Naval or Military Discharge Certificates) and/or 18 U.S.C. § 1002 (Possession of false papers to defraud United States) involving Darryl Hodgkinson (Hodgkinson) since October 1, 1998, including Certificates of Discharge from Active Duty (Department of Defense Forms 214), Corrections to Department of Defense Form 214 (Department of Defense Forms 215), Army Discharge Review Board briefs and all insert forms, letters from Colonel William E. Weber, any letter mailed to Hodgkinson from the Department of the Army and all other military documents possessed by Hodgkinson.

b. The term "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

## AFFIDAVIT

STATE OF WEST VIRGINIA

COUNTY OF CABELL, to-wit:

    I, Special Agent Benjamin M. LaBuz, being first duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the Department of Veterans Affairs (VA), Office of Inspector General (OIG), Criminal Investigation Division (CID) and am assigned to the Mid-Atlantic Field Office, Washington, D.C. I have been in my current position since June 2007. In my current position with the VA/OIG, I investigate violations of federal laws including Title 18 United States Code § 641, Theft of Government Funds; Title 18 § 1001, False Statements; Title 18 United States Code § 1002, Possession of False Papers to Defraud the United States; and Title 18 United States Code § 704(b), False Claims About Receipt of Military Decorations or Medals.

2. Agents employed by the VA/OIG are conducting this investigation with the assistance of VA, Veterans Benefits Administration employees, VA Forensic Document Examiners, and other law enforcement agencies. Statements contained in this affidavit are based, in part, on my experience and training as a Special Agent with the VA/OIG as well as information provided to me by other officers and employees with the VA. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe that DARRYL J. HODGKINSON (HODGKINSON) violated Title 18 United States Codes, 498 and 1002.

3. This Affidavit is submitted in support of an application for a search warrant of the residence and outbuildings of HODGKINSON, 4600 Blankenship Road, Huntington, WV 25701.

## Relevant Laws

4. Title 18 United States Code § 1002 provides that it is a violation of federal law to knowingly and with intent to defraud the United States, or any agency thereof, possesses any false, altered, forged, or counterfeited writing or document for the purpose of enabling another to obtain from the United States, or from any agency, officer or agent thereof, any sum of money.

5. Title 18 United States Code § 498 provides that it is a violation of federal law to forge, counterfeit, or falsely alter any certificate of discharge from the military or naval service of the United States, or use, unlawfully possess or exhibit any such certificate, knowing the same to be forged, counterfeited, or falsely altered.

## Veterans Affairs Programs

6. HODGKINSON is a veteran of the United States military in receipt of monthly disability compensation benefits for post traumatic stress disorder (and secondary medical conditions resulting from the treatment of post traumatic stress disorder). These disability compensation benefits are provided by the VA.

7. Service connection benefits for post traumatic stress disorder require medical evidence establishing a clear diagnosis of the condition, credible supporting evidence that the claimed in-service stressor actually occurred, and a link, established by medical evidence, between current symptomology and the claimed in-service stressor. If the claimed stressor is related to combat, service department evidence that the veteran was engaged in combat or that the veteran was awarded the Purple Heart, Combat Infantryman Badge, or similar combat

citation will be accepted, in the absence of evidence to the contrary, as conclusive evidence of the in-service stressor.

## Summary for Basis for Search Warrant

8. Based upon the information provided in this affidavit, this affiant believes that probable cause exists that HODGKINSON violated Title 18, United States Codes 498 and 1002.

9. This affiant has probable cause to believe that HODGKINSON committed the offenses of possession of false papers to defraud United States, 18 U.S.C. § 1002 and naval or military discharge certificates, 18 U.S.C. § 498 on all occasions when HODGKINSON possessed and submitted altered military discharge certificates and altered documents to the VA, Cabell County Clerk's Office, and Congressman Nick Rahall's Office in a continuing scheme to defraud the United States Department of Veterans Affairs.

## Findings

10. On or about October 31, 1971, HODGKINSON was discharged from the United States Army under "other than honorable" conditions. Veterans who receive an "other than honorable" discharge from the Unites States Armed Forces do not automatically qualify for VA benefits.

11. In or about May 1976, HODGKINSON petitioned the Army Discharge Review Board for an upgraded discharge. HODGKINSON'S military service record was compiled into a ten page data sheet that was used by members of the Army Discharge Review Board when reviewing HODGKINSON'S appeal for an upgraded discharge. On January 30, 1978, Colonel William E. Weber, commander of the Army Discharge Review Board, mailed HODGKINSON a letter informing HODGKSINSON that his upgraded discharge was approved. The

letter stated that HODGKINSON would receive official notification from the Adjutant General. On June 5, 1978, Colonel Weber mailed HODGKINSON another letter informing HODGKINSON that his upgraded discharge was approved. The letter stated that HODGKINSON would receive official notification from the Adjutant General. On July 13, 1978, Department of Defense Form 215 (Correction to DD Form 214, Report of Separation from Active Duty) was issued by Brigadier General J. C. Pennington, Adjutant General, officially upgrading HODGKINSON'S discharge to "General". Veterans who receive a "General" discharge from the United States Armed Forces are eligible for VA benefits.

12. Since approximately 1998, HODGKINSON has utilized Disabled American Veterans offices in Reno, Nevada and Huntington, WV to represent him when submitting claims for disability compensation to the VA. At various times from 1998 to present, Disabled American Veterans Service offices have submitted claims to the VA on HODGKINSON'S behalf.

13. On or about August 30, 1998, the VA Regional Office (VARO), Reno, NV, received a Memorandum from the Disabled American Veterans, National Service Office, informing them that HODGKINSON had provided documentation showing he received an upgraded discharge from the Army Discharge Review Board. The documentation was submitted in support of a pending claim for post traumatic stress disorder and another ailment. The document believed to be altered that was submitted to the VA by HODGKINSON through the Disabled Americans Veterans office was:

    (a). A ten page Army Discharge Review Board brief

14. On or about August 16, 1999, the VARO Huntington, WV, mailed HODGKINSON a letter informing him that his claim for post traumatic stress disorder disability compensation was denied because he did not provide documents the VA requested, which were necessary to process his claim.

15. On September 25, 2000, the VARO Huntington, WV, received notification from the Disabled Americans Veterans, National Service Office, Huntington, WV, informing them that HODGKINSON provided additional evidence supporting his claim for disability compensation benefits. The altered documents submitted to the VA by HODGKINSON through the Disabled Americans Veterans office were:

    (a). A Department of Defense Form 214 (Certificate of Discharge from Active Duty)

    (b). A ten page Army Discharge Review Board brief

16. On or about September 29, 2000, the VARO Huntington, WV, mailed HODGKINSON a letter informing him that his application for post traumatic stress disorder benefits was denied because post traumatic stress disorder disability compensation may not be granted in the absence of either a verifiable stressing event or the documented award of combat medals or the Purple Heart.

17. On or about October 2, 2000, HODGKINSON submitted an appeal to the VA. HODGKINSON stated he wanted to appeal the VA's decision before the Board of Veterans' Appeals. In his appeal, HODGKINSON wrote: "I submitted documentation showing the Board of Corrections upgraded decision. On the upgraded DD 214, it clearly lists that (2) Purple Hearts were awarded. This should verify the stressors. There is also other paperwork submitted with the upgrade from the Board showing 2 Purple Heart awards." The altered documents submitted to the VA by HODGKINSON through the Disabled Americans Veterans office were:

    (a). A Department of Defense Form 214 (Certificate of Discharge from Active Duty)

    (b). Nine pages of an Army Discharge Review Board brief

18. On April 26, 2001, the VARO Huntington, WV, received a letter allegedly signed by Colonel William E. Weber. The letter, which was dated April 2, 2001, stated, in part, that HODGKINSON'S Department of Defense (DOD) file has

been sealed. The letter also stated that HODGKINSON was sent a copy of his upgraded discharge showing the citations and awards that were authorized.

19. On or about August 6, 2001, the VARO Huntington, WV, granted HODGKINSON service connected disability compensation for post traumatic stress disorder at 50%, service connected disability for a residual gunshot wound to the right arm at 0% and service connected disability for a residual shell fragment wound to the right lower extremity at 0%. HODGKINSON'S new rating was effective August 1998, the month of his original claim for post traumatic stress disorder disability compensation benefits. HODGKINSON'S rating decision stated in part:

    (a). "He furnished copies of a revised DD 214 and Discharge Review Board documents which showed award of Combat Infantryman's Badge (CIB) and Purple Hearts, comments that he was wounded twice in RVN, and one of these Review Board documents also referred to "Vietnam syndrome," but these were not official copies. Letter from the Military Review Boards Agency indicates that, because of the nature of his missions in RVN, the DOD has sealed his file."

20. On or about December 19, 2001, HODGKINSON submitted an appeal to the Board of Veterans' Appeals. HODKGINSON appealed the VA's PTSD rating of only 50% and the ratings of 0% service connection for residual gunshot wound to the right arm, and 0% service connection for residual shell fragment wound to the right lower extremity.

21. On or about March 5, 2002, HODGKINSON had his hearing before the Board of Veterans' Appeals. On or about April 7, 2003, the Board of Veterans' Appeals increased HODGKINSON'S service connected disability compensation benefits for post traumatic stress disorder to 100% because HODGKINSON convinced the Board of Veterans' Appeals that his disability was more disabling than the 50% rating previously awarded.

22. In May 2003, Nick Hun, employee, VARO Huntington, WV, became concerned that HODGKINSON may have added medals to his military discharge paperwork. A copy of HODGKINSON'S official military record was requested from the National Archives and Records Administration, St. Louis, MO. VARO employees received official copies of HODGKINSON'S service record and notified the VA/OIG that they believed HODGKINSON altered military documents to reflect that he was awarded the Purple Heart medal.

23. On March 5, 2009, VA/OIG agents interviewed HODGKINSON regarding allegations that HODGKINSON altered military documentation that was used as a basis to grant disability compensation benefits. HODGKINSON stated, in part, that his records were sealed because he was a special operations sniper. HODGKINSON stated he went to Jump School in October or November 1969. HODGKINSON could not explain how a letter could be signed by Army officials (Colonel Weber) who retired prior to the date of the letter.

24. On or about April 7, 2009, HODKGINSON mailed Congressman Nick Rahall a letter regarding a recent interview HODGKINSON had with VA/OIG Special Agents. The letter states, in part: "I (HODGKINSON) am enclosing documents that my wife and I found while searching for the envelope to the original documents in question. The documents that I am attaching has proof of my 2 purple hearts, CIB and Jump School." These documents were then mailed to the VA/OIG Headquarters in Washington, D.C. The altered documents mailed to the VA/OIG by Congressman Nick Rahall's office were:
    (a). A letter from Col. William Weber
    (b). An Army Discharge Review Board brief

Additionally, two Department of Defense Form 214s (Certificate of Discharge from Active Duty) were mailed to the VA/OIG. These documents are being submitted to the VA/OIG Forensic Document Laboratory for analysis. These are

believed to be altered because they reflect that HODGKINSON was a trained airborne infantryman and Special Forces soldier who received two Purple Heart medals and Silver Wings, all of which are known to be false.

25. On July 19, 2009, I received an Information Paper from the United States Army, Military Awards Branch, stating they reviewed historical casualty records for the Vietnam era and did not find HODGKINSON'S name among the list of battle casualties. They also reviewed historical unit awards records and were unable to locate orders announcing the award of Purple Heart under HODGKINSON'S name or social security number. They also reviewed HODGKINSON'S official military personnel file and were unable to locate any documentation indicating he received treatment for wounds received as a direct result of enemy action.

26. On January 22, 2010, I received a Memorandum from the Department of the Army, United States Army Maneuver Excellence Center, stating they had no record of HODGKINSON attending the United States Army Basic Airborne Course or being awarded the Parachutist Badge.

27. On January 29, 2010, I interviewed Colonel Weber regarding the letter he allegedly signed on April 2, 2001 that HODGKINSON provided to the VA. Col. Weber stated he retired in 1978 and did not sign the letter. Col. Weber stated the Army Discharge Review Board would not have mailed a letter stating a soldier's Department of Defense record was sealed because it was not a function of the Army Discharge Review Board.

28. At various times from June 2009 to present, I have reviewed HODGKINSON'S personnel records, which were obtained from the National Archives and Records Administration. A review of these records has yielded no documentation of HODGKINSON being an infantryman, being awarded the Combat Infantryman Badge, being awarded the Purple Heart medal or being

awarded the Parachutist Badge. Additionally, I have reviewed a copy of the Army Discharge Review Board brief provided by the National Archives and Records Administration to the VARO. The copy provided by the National Archives and Records Administration has no reference of HODGKINSON being awarded the Purple Heart or Combat Infantryman Badge.

29. On March 17, 2010, I coordinated with Nancy Cox, VA/OIG Forensic Document Examiner, regarding an examination I requested of documents HODGKINSON submitted to the VA. Cox's examination revealed that the Army Discharge Review Board brief submitted on September 25, 2000, had been altered to reflect HODGKINSON being awarded the Purple Heart medal and Combat Infantryman Badge. Cox noted that several other portions of the Army Discharge Review Board brief had been altered as well. Additionally, Cox determined that the DD Form 214 (Certificate of Discharge from Active Duty) submitted by HODGKINSON to the VA on September 25, 2000, had been altered to reflect HODGKINSON being awarded two Purple Hearts and the Combat Infantryman Badge. Cox noted that several other portions of the DD Form 214 had been altered as well. Cox also determined that the letter signed by Colonel Weber that was submitted to the VA on April 26, 2001, was an alteration of a letter mailed to HODGKINSON in 1978 by the Army Discharge Review Board. Cox has not completed the examination of the Army Discharge Review Board brief submitted in October 1998, but after a preliminary review of the document, it is believed to be an altered copy.

30. On March 25, 2010, I contacted Teri Booth, an employee of Congressman Nick Rahall's Office, in regards to a Congressional inquiry initiated by HODGKINSON in March 2009. Booth stated that HODGKINSON e-mailed Congressman Rahall's office in March 2009, in regards to his interview with VA OIG agents. HODGKINSON electronically attached images of military discharge documentation and other files in his e-mail to the Congressman. Because Congressman Rahall's office does not accept Congressional inquiries via e-mail,

HODKGINSON mailed the documents to Congressman Rahall's Huntington, WV office. On March 25, 2010, Booth faxed me a copy of their file on HODGKINSON. Among the documents HODGKINSON mailed was a fraudulent copy of the Army Discharge Review Board brief that was previously submitted by HODGKINSON to the VARO on September 25, 2000 and two DD Form 214s (Certificates of Discharge from Active Duty). Neither of the DD Form 214s submitted to Congressman Rahall's office have ever been submitted to the VARO by HODGKINSON. These are believed to be altered because they reflect that HODGKINSON was a trained airborne infantryman and Special Forces soldier who received two Purple Heart medals and Silver Wings, all of which are known to be false.

31. Included in the information provided by Booth was a hard copy of the e-mail HODGKINSON sent to Congressman Rahall. The header of the e-mail indicates the message is from danddj@dishmail.net (the initials of Doria and Darryl Jack HODGKINSON) and was sent to "Rahall, Nick" on March 29, 2009. The email contained fourteen electronic attachments, including two titled "DD214.jpg". Embedded in the letter of the message was an image of the letter signed by Colonel Weber, dated April 2, 2001. This letter has previously been examined by a forensic document examiner and is known to be an altered copy of a letter Colonel William mailed to HODGKINSON in 1978.

32. On March 25, 2010, the Cabell County Clerk's Office, Cabell, WV, provided copies of documents that HODGKINSON filed with the Clerk's Office on March 6, 2009. These documents include a letter from Colonel Weber dated April 2, 2001. This letter has previously been examined by a forensic document examiner and is known to be an altered copy of a letter Colonel William mailed to HODGKINSON in 1978. Also provided was a Certificate of Discharge from Active Duty, effective date October 31, 1971. This certificate contains text reflecting HODGKINSON was a Special Forces trained soldier who was awarded two Purple Heart medals and Silver Wings, all of which are known to be false.

## Conclusion

33. This investigation revealed that HODGKINSON submitted altered military documentation at various times between October 1998 through March 2009 to the VA, the Cabell County Clerk's Office and Congressman Rahall's office in Huntington, WV. Between HODGKINSON'S first submission of altered documents in 1998 and the last known submission in April 2009, a period of over ten years, HODGKINSON maintained altered military documents he used in a scheme to fraudulently obtain approximately $310,708 in disability compensation benefits from the VA.

34. HODGKINSON submitted hard copies of altered documents as recently as April of 2009 and electronic copies of altered military discharge documents and other altered military documents as recently as March of 2009. Even after being questioned about the fraudulent documents during an interview with Special Agents of the VA/OIG in March 2009, HODGKINSON again submitted altered military documents to both the Cabell County Clerk's Office and Congressman Rahall's office.

35. Your affiant, being a veteran of the Armed Forces, knows that veterans are strongly encouraged to safeguard military discharge documentation and other military documentation. These documents are used to provide eligibility for a large number of benefits offered to veterans by both federal and state government agencies.

36. Your affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule

41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, the warrant application requests permission to search and seize altered military discharge documents and other altered military documents, including those that may be stored on a computer. These documents constitute both evidence of crime and contraband. This affidavit also requests permission to seize the computer hardware that may contain files containing altered military documents if it becomes necessary for reasons of practicality to remove the hardware and conduct a search off-site. Your affiant believes that, in this case, the computer hardware is a container for evidence, a container for contraband, and also itself an instrumentality of the crime under investigation.

37. I submit that if a computer or electronic medium is found on the premises, there is probable cause to believe those electronic records referenced above will be stored in that computer or electronic medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

38. Based on my training and experience as a Special Agent with the VA/OIG and as a veteran of the Armed Forces of the United States, your affiant believes probable cause exists to search the residence of DARRYL HODGKINSON for altered military discharge certificates and other altered military documentation used in a scheme to defraud the VA, in violation of Title 18, United States Codes 498 and 1002.

39. Your affiant respectfully seeks:
   1) permission to search and seize records (listed in Attachment B) that might be found at the residence and outbuildings of DARRYL J. HODGKINSON, 4600 Blankenship Road, Huntington, WV 25701, in whatever form they are found.

## SPECIAL CONSIDERATIONS CONCERNING SEARCHES AND SEIZURES OF COMPUTER SYSTEMS AND/OR EVIDENCE OTHERWISE IN ELECTRONIC FORM

40. Your affiant is aware of the following:

a.   Computer storage devices such as hard disks, diskettes, tapes, laser disks, and other electronic media, can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence by storing it in random order with deceptive file names and otherwise commingling unrelated data with evidence of crimes. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks to months, depending on the volume of data stored. It would impractical to attempt this type of data search at the search site or to rely on a third-party (such as an internet service provider like AOL or MSN) to conduct the search;

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

c.      The analysis of electronically stored data requires any or all of several different techniques. The application for search warrant seeks the search for and seizure of electronic evidence through use of techniques that may include, but are not limited to the following:

> i.      surveying various file "directories" and the individual files they contain (which is analogous to looking at the outside of a file cabinet for the pertinent files in order to locate the evidence and instrumentalities authorized for seizure by the warrant);
> ii.     "opening" or reading the first few "pages" of such files in order to determine their precise contents;
> iii.    "scanning" storage areas to discover and possibly recover recently deleted data;
> iv.     scanning storage areas for deliberately hidden files; and
> v.      performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences

of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

41. Necessarily, some data may be captured that does not constitute evidence of the crimes detailed by the search warrant. However, only evidence of a crime, contraband, fruits of crime, or other items illegally possessed, and/or property designed or intended for use in committing a crime that are authorized for seizure by the warrant will be copied from the original electronic media and segregated on separate electronic media or converted to printed form. Should the electronic media contain no (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; and/or (3) property designed or intended for use in committing a crime, the United States shall return within a reasonable time the electronic media to the person or entity from whom it was seized. However, if the electronic media does contain (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; and/or (3) property designed or intended for use in committing a crime, the United States will retain all of the original electronic media in evidence for the purpose of authenticating the evidence segregated therefrom as provided above.

Further your affiant sayeth naught.

_____
Benjamin M. LaBuz
Special Agent
Department of Veterans Affairs
Office of the Inspector General

Sworn to before me, and subscribed in my presence, this 30th day of March, 2010.

_____
Maurice G. Taylor, Jr.
United States Magistrate Judge